FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2006 APR 21 PM 12: 33
CLERK _____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 106-012 |
| | ) | |
| DEWAYNE RODRIQUEZ SCOTT | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant Dewayne Rodriquez Scott ("Scott") of possession of a firearm by a convicted felon, possession with intent to distribute cocaine hydrochloride (powder) and MDMA (ectasy), and possession of a firearm in furtherance of a drug trafficking crime. The matter is now before the Court because Scott filed a Motion to Suppress Evidence and Request for Jackson - Denno Hearing. (Doc. no. 9). An evidentiary hearing was held, at which time the Court heard testimony from Josh Stephens, an officer with Georgia's State Board of Pardons and Paroles at the time of the events in question, Julie Sancken and Brian Ely, both officers with Georgia's State Board of Pardons and Paroles, Larry Bracken, an Investigator with the Richmond County Sheriff's Office, Ronald Rhodes, a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms, and Lequinta Polk, Scott's girlfriend. Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

## I. FACTS

Scott is a convicted felon who has served time in the Georgia prison system for multiple drug offenses. He was released on parole on or about February 14, 2003. On February 17, 2003, Scott's Parole Officer, Julie Sancken ("Officer Sancken"), met with him and went over the parole certificate, including the standard conditions of parole. One of these standard conditions that applies to parolees statewide in Georgia provides that Scott's "Parole Officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, place of residence, automobile or any other property under my control." Gov't Ex. A. Officer Sancken's review of the standard conditions of parole was the second time that Scott had been informed of these conditions, as a prison official had also reviewed the conditions with Scott prior to his release. Gov't Ex. C. After both meetings concerning the conditions of Scott's parole, Scott verified his understanding of the conditions with his signature. Gov't Exs. A & C.

On August 22, 2005 at approximately 4:30 p.m., then-parole officer Josh Stephens ("Officer Stephens") received an anonymous telephone tip that a person known as "Sam" was in possession of a large amount of cocaine at 167-A Petersburg Circle. Officer Stephens testified that he did not recognize the voice of the anonymous caller and acknowledged that the tipster did not say how he knew about the drugs. A check of the parole office database revealed that Scott resided at the address identified by the tipster. Officer Stephens then contacted Larry Bracken ("Inv. Bracken") at the Richmond County Sheriff's Office ("RCSO") and found out that Inv. Bracken had also received information about "Sam" selling drugs at the same address identified by Officer Stephens's tipster. However, Inv.

Bracken had not yet acted on the tip he had received.[1]

In addition to matching Scott's address in the parole database to the address given by the tipster and knowing that Inv. Bracken had also received information about "Sam" selling drugs at the same address, Officer Stephens knew that approximately five months earlier, on March 10, 2005, Scott had been arrested at 167-A Petersburg Circle on a parole violation. At that time, Scott had a bloody nose from what Officer Stephens believed to be Scott's self-described use of cocaine.[2] Moreover, prior to August 22, 2005, Scott's parole officers had met with him several times for routine supervision meetings at 167-A Petersburg Circle. Based on all of this information, Officer Stephens and other parole officers, including Officer Sancken, Brian Ely ("Officer Ely"), Jim Padgett ("Officer Padgett"), Terrell Yelverton ("Supervisor Yelverton"), as well as three law enforcement officials from the RCSO, including a K-9 unit, met not far from Scott's residence to formulate a plan for how to go about searching the residence. Although the members of the assembled group met with the foregone intention of searching Scott's residence, no one in the group sought a search warrant. No warrant was sought because under the terms of Scott's parole, as described

---

[1] Inv. Bracken testified that his information came from one of his cooperating sources who was trying to "work off" charges. This source had provided reliable information to Inv. Bracken two to three times before providing information about "Sam." Inv. Bracken also testified that because the source would have wanted credit for his information, it was unlikely that his source would have contacted another agency (via Officer Stephens) and risked losing credit toward his charges.

[2] Officer Stephens testified that Scott never actually said that he had used "cocaine," but Scott had used a slang term that Officer Stephens interpreted to mean Scott had been using cocaine. Moreover, Officer Sancken testified that after Scott's March 10 arrest, she had been trying to get Scott into a substance abuse program for his problem with cocaine, and prior to the March 10 arrest, Scott had had urine screens that tested positive for cocaine.

above, he had agreed to warrantless searches of his "person, papers, place of residence, automobile or any other property under [his] control," and 167-A Petersburg Circle was his residence of record.

The group decided that Officers Sancken and Ely would go to the front door first, before the other officers converged on the scene. No one answered the door when the parole officers knocked, but they saw someone looking out the upstairs window. Neither officer could confidently swear as to who had been looking out the window, but Officer Sancken was fairly certain it was Scott. Unable to get anyone to answer the door, the officers waited for someone to arrive at, or leave, the residence.

Scott's girlfriend and the leasee of the residence at 167-A Petersburg Circle, Ms. Polk, eventually arrived and spoke with Officers Sancken and Ely outside the residence. When the officers asked her if Scott was home, Ms. Polk seemed to equivocate,[3] first suggesting that Scott should be home watching her son but then suggesting that perhaps he had left for a short while.[4] Then she suggested that perhaps Scott had left for work. However, Ms. Polk stated that Scott was expected home later that evening.

Officer Sancken testified that, at that point, she told Ms. Polk that they may come back later. Officer Sancken did not intend to abandon her intention of searching the residence, but she testified that she was not sure how the plan to search would proceed in

---

[3] Ms. Polk testified at the hearing that when officers had gone to the residence on March 10, 2005 with an arrest warrant for Scott based on a parole violation, she had lied to the law enforcement officials about Scott's presence in the residence.

[4] Ms. Polk testified that her 8-year old son was at home when the officers had initially knocked on the door, and as he would not open the door for anyone, she thought it was probably he who had looked out the upstairs window.

4

light of the information provided by Ms. Polk. However, Officer Ely then spoke up and bluntly said that they were there to search because this was Scott's residence of record, and if necessary, they had a K-9 unit available to assist them. The testimony at the hearing varied slightly between Officers Sancken and Ely and Ms. Polk as to exactly what was said to Ms. Polk to gain admission to the residence, but the testimony does not waiver that Ms. Polk opened the door to the officers; moreover, although Ms. Polk asked to get her son out of the residence, she did not otherwise place restrictions on the officers' ability to search.[5]

Officers Sancken and Ely followed Ms. Polk into the house, and the other law enforcement officials who had congregated a short distance from the residence then made their way to the residence. Officers Stephens and Ely, along with Supervisor Yelverton, went upstairs to search, and Officers Sancken and Padgett starting "clearing" the downstairs and noticed that there was a closet under the stairs. Scott was discovered hiding under blankets in this closet and was detained. Officer Sancken testified that at about the time Scott was being pulled out of the closet, the K-9 unit arrived. The dog alerted in Scott's upstairs bedroom. In a dresser drawer in the bedroom, officers discovered powder cocaine, Ecstasy tablets, a loaded Bryco .380 caliber semi-automatic pistol, and identification belonging to Scott.

Local law enforcement had also called Ronald Rhodes, a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms ("SA Rhodes"), to the scene. When SA Rhodes

---

[5]Ms. Polk testified that as she and her son were making their way down the stairs to exit the residence, several officers had already entered the house. However, as discussed in detail, *infra*, the details of Ms. Polk's consent and the timing of the officers' entry to the residence once Ms. Polk opened the door are not material to the Court's recommended resolution of the motion to suppress.

arrived at the residence at approximately 7:20 p.m., four parole officers and three RCSO officials were present; a Columbia County Narcotics Investigator, Mike Williamson, arrived shortly thereafter.[6] SA Rhodes testified that when he arrived, he took some photographs and spoke with Ms. Polk in front of the residence. SA Rhodes then went inside the residence to interview Scott.

Although other officers were in the residence, Officer Sancken and Supervisor Yelverton were the ones present at the dining table where SA Rhodes conducted his interview with Scott. Before conducting his interview, SA Rhodes presented Scott with a written statement of his right to remain silent and to obtain the advice of counsel, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). SA Rhodes also verbally advised Scott of his Miranda rights.[7] Scott signed the waiver of rights form, Gov't Ex. B, and verbally expressed to SA Rhodes that he understood his rights. SA Rhodes confidently testified that Scott voluntarily participated in the interview in which he (Scott) made incriminating admissions about the drugs and firearm that had been found in the residence.[8] SA Rhodes also testified

---

[6]The residence is located within approximately one half mile of the Richmond and Columbia County lines, and Inv. Bracken with the RCSO had received information about "Sam's" activities at the residence, so officers from both jurisdictions were present.

[7]Neither side appears to dispute that Scott was in custody at the time SA Rhodes interviewed him.

[8]SA Rhodes testified that although some of the details in his report concerning exactly which local law enforcement officials and parole officers had done or said certain things prior to his arrival may have been confused simply because SA Rhodes wrote a summary of what Officer Stephens told him (SA Rhodes) upon his arrival at the scene, Scott's statements made during the interview are accurately recorded in the Report of Investigation. See Def.'s Ex. 2. Scott has not challenged the veracity of the statements attributed to him in the Report.

that no threats or coercion had been used to get Scott to talk, and no promise of benefit had been made. Scott presented no evidence to contradict, let alone refute, SA Rhodes's testimony concerning the manner in which Scott waived his rights. Scott neither testified nor submitted an affidavit stating that he felt threatened or coerced into talking with SA Rhodes or otherwise suggesting that he did not voluntarily waive his rights, and Ms. Polk provided no testimony concerning the circumstances of Scott's interview with SA Rhodes.

## II. DISCUSSION

A.   **Jackson-Denno Inquiry**

Scott requested a hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964), to contest the voluntariness of his statements made to SA Rhodes. As described above, the Court heard testimony from SA Rhodes concerning the manner in which he obtained a waiver of rights from Scott. Scott did not take the stand or provide any factual support for defense counsel's contention that Scott's incriminating statements were not made voluntarily.

Under Miranda v. Arizona, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). As to whether Scott validly waived his constitutionally protected rights under Miranda, two distinct inquiries must be made. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Second, the waiver must have been made with a full awareness of both the nature of the

7

right being abandoned and the consequences of the decision to abandon it." Id. However, as the Supreme Court cautioned in Miranda, if an interrogation continues without the presence of an attorney and a statement is taken, a "heavy burden" rests on the government to demonstrate that the defendant knowingly, intelligently, and voluntarily waived his privilege against self-incrimination and his right to appointed counsel. Miranda, 384 U.S. at 485. When making this determination, the Court must look at the totality of the circumstances and the entire course of police conduct. Oregon v. Elstad, 470 U.S. 298, 318 (1985). In the Eleventh Circuit, voluntariness is judged by looking at a variety of factors, none of which alone are dispositive. United State v. Gonzalez, 71 F.3d 819, 830 (11th Cir. 1996). These factors include: the defendant's custodial status, coercive police procedures, the defendant's cooperation or awareness of the right to refuse consent, and the defendant's education and intelligence. Id.

Here, SA Rhodes testified that Scott had been informed of his Miranda rights and twice signed the waiver of rights form indicating that he wished to waive his rights and talk to SA Rhodes. Additionally, SA Rhodes testified that no threats or coercion were used against Scott, and importantly, Scott himself has never provided any factual support for counsel's suggested scenario of "intimidation by numbers" (doc. no. 9, p. 13) or for any contention that he felt threatened or coerced. In fact, at the time SA Rhodes went in to the residence to conduct his interview, the only persons present with Scott were his parole officer and that officer's supervisor. That there were other law enforcement officers on the scene,

8

moving throughout the residence doing their various assigned tasks hardly leads to a conclusion that Scott was intimidated into signing the waiver of rights form.[9]

Simply put, the Court heard no testimony from any witness suggesting that intimidation, coercion, and/or deception were used on Scott or that Scott harbored any misunderstanding of his rights that he agreed to waive when he signed the waiver of rights form. To the contrary, the only evidence in the record is that Scott was informed of his rights - verbally and in writing- and that Scott expressed his understanding of his rights and his desire to waive them - verbally and in writing. See Gov't Ex. B and Testimony of SA Rhodes. He then willingly agreed to participate in an interview with SA Rhodes.

In sum, upon conducting the requested Jackson-Denno inquiry, the Court concludes that Scott's incriminating statements to SA Rhodes were made freely and voluntarily, with a full awareness of Scott's right to remain silent and to receive the advice of counsel. As such, there is no basis for this Court to recommend suppression of Scott's statements.[10]

---

[9]The Court also notes that Scott is no stranger to the criminal justice system and is not unfamiliar with the manner in which encounters with law enforcement officials unfold. Moreover, Officer Sancken, his parole officer for over two years, was present with him at the time SA Rhodes arrived, thus dispelling any notion that Scott was somehow surrounded by a roomful of strangers who could have intimidated Scott into waiving his right to remain silent. Additionally, Scott had been arrested on a parole violation at his residence just months prior the August 22nd encounter and had had numerous routine parole supervision meetings in his residence. In sum, Scott was not completely unaccustomed to having officers in his residence such that the Court would be willing to presume - without benefit of evidentiary support - that the mere presence of officers in the residence intimidated Scott into waiving his rights.

[10]To the extent defense counsel suggested in his pre-hearing briefing that Scott's statements should be suppressed because they were made as the result of an unlawful entry to the residence (doc. no. 9, pp. 11-12), the defense abandoned that argument at the hearing when counsel stated that Scott was not arguing that officers should have had a warrant prior to entering the house, but rather that the evidence discovered could only be used in probation

### B. Warrantless Search of Scott's Residence of Record

Prior to the evidentiary hearing, defense counsel took the position that because none of the officers had a search warrant or arrest warrant when they arrived at 167-A Petersburg Circle, they were required to obtain Ms. Polk's voluntary consent to search the residence and to limit their search to looking for Scott, not evidence of contraband. (See doc. no. 9, pp. 2-8, 9-11). Indeed, even at the evidentiary hearing, counsel spent much of his time questioning the facts and circumstances under which Ms. Polk granted the officers access to the residence. Then, in an abrupt shift, during his argument at the end of the hearing, counsel contended that Scott was not challenging the warrantless entry to the residence (thus, dispelling the need to resolve exactly what transpired between Ms. Polk and Officers Sancken and Ely outside the residence), but rather was challenging how the incriminating contraband found in the residence could be used. According to defense counsel, the drugs and weapon discovered can be used in parole revocation proceedings, but they cannot be used to form the basis for the new federal charges which Scott now faces.

In support of this new argument, counsel cited several older cases from both state and federal courts for the proposition that warrantless probationary searches cannot be used as "a subterfuge for criminal investigations." United States v. Consuelo-Gonzalez, 521 F.2d 259, 267 (9th Cir. 1975); see also Owens v. Kelley, 681 F.2d 1362, 1368-69 (11th Cir. 1982) (stating that a search performed pursuant to condition of probation allowing warrantless searches must "be carried out in a reasonable manner and only in furtherance of the purposes

---

revocation proceedings. In any event, as discussed in detail *infra*, there was no unlawful entry to the residence.

of probation" and should not be used in "intimidating and harassing" fashion to serve law enforcement ends "totally unrelated" to the probationer's conviction or rehabilitation); Croteau v. State, 334 So.2d 577, 579 (Fla. 1976) (concluding that "while evidence obtained in violation of the Fourth Amendment may be admissible against the probationer at a revocation hearing, such evidence cannot constitutionally be admitted at a criminal trial").[11] However, as the Court noted at the hearing, the line of cases cited by counsel is not applicable in this case, particularly in light of more recent United States Supreme Court precedent.[12]

In United States v. Knights, Mark James Knights was on probation for a drug offense in California, and as part of his conditions of probation, he agreed to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. 112, 114 (2001). When local law enforcement officials gathered information that lead them to suspect Knights had been involved in a rash of acts

---

[11]Notably, in Croteau, the Florida Supreme Court specifically noted that the terms of the appellant's probation did not include submission of his person and property to search or seizure at any time, with or without a warrant. 334 So.2d at 578 n.1. As noted above, in the case now before the Court, Scott specifically agreed to warrantless searches of person and property. Moreover, a recent decision out of a lower appellate court in Florida has recognized, without resolving, that the decision in Croteau has likely been superseded, at least in part, by United States v. Knights, 534 U.S. 112 (2001). State v. Yule, 905 So.2d 251, 253 n.3 (Fla. Dist. Ct. App. 2005). The Knights decision is discussed in detail *infra*.

[12]Although the Court offered the defense one week to file a supplemental brief on this new argument concerning how the contraband discovered during the warrantless search could be used, or any other argument relevant to the motion to suppress, counsel notified the Court and opposing counsel that no new briefing would be filed prior to the Court's entry of a recommendation on the motion to suppress.

of vandalism against Pacific Gas and Electric power transformers, a detective who was aware of Knights's conditions of probation decided to search Knights's apartment without first obtaining a warrant. Id. at 114-15. Upon discovery of contraband associated with the acts of vandalism during that warrantless search, Knights was subsequently indicted by a federal grand jury for conspiracy to commit arson, for possession of an unregistered destructive device, and for being a felon in possession of ammunition. Id. at 116.

Knights moved to suppress the evidence discovered during the warrantless search, and a district court ruled that even though the detective had "reasonable suspicion" that Knights was involved in the vandalism, the evidence must be suppressed because "the search was for 'investigatory' rather than 'probationary' purposes." Id. The Court of Appeals for the Ninth Circuit affirmed, and the Supreme Court took the case to "decide whether a search pursuant to this probation condition (submission to warrantless searches), and supported by reasonable suspicion, satisfied the Fourth Amendment." Id. at 114. The Supreme Court concluded that the Fourth Amendment was satisfied under such circumstances. Id. at 122.

The key issue was not whether a probationer's acceptance of such a probation condition amounted to consenting voluntarily to waive all Fourth Amendment rights, but rather whether such a search, supported by reasonable suspicion, was reasonable under a "totality of the circumstances" analysis.[13] Id. at 118. The Supreme Court found that the warrantless search condition, coupled with the probationer's awareness of that provision,

---

[13]Notably, on February 22, 2006, the United States Supreme Court heard oral argument on the issue of whether suspicionless searches of parolees are reasonable under the Fourth Amendment. Samson v. California, No. 04-9728. As of the date of this Report and Recommendation, no decision in Samson had been issued by the Supreme Court.

12

diminished his reasonable expectation of privacy, and the State's strong interest in monitoring likely recidivists to prevent further criminal activity also figured into the balancing test. Id. at 119-21.

> We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

Id. at 121 (internal citations omitted).[14] Moreover, contrary to Scott's current argument, the Supreme Court did not place any restriction on the manner in which the evidence discovered during such a warrantless search could be used. Indeed, Knights was on probation for a drug offense, but the evidence discovered in his apartment after the warrantless search was used to indict him, *inter alia*, for offenses related to arson. Id. at 116.

---

[14] The Eleventh Circuit has since utilized the balancing test, including the reasonable suspicion standard, from Knights to analyze the reasonableness of the warrantless search of a probationer's computer in a situation where there was no express condition of probation allowing warrantless searches. United States v. Yuknavich, 419 F.3d 1302, 1309-11 (11th Cir. 2005). The Eleventh Circuit concluded that "[d]espite the absence of a state regulation or search condition requiring [the probationer] to submit to warrantless searches," his expectation of privacy in his computer was greatly reduced, and the probation officers needed no more than reasonable suspicion to search. Id. at 1311. As the search was supported by reasonable suspicion, the court of appeals affirmed the district court's decision denying the probationer's motion to suppress.

As noted above, the <u>Knights</u> Court defined reasonable suspicion as "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." <u>Id.</u> at 121. Here, Officer Stephens and Inv. Bracken had separately received information that "Sam" at 167-A Petersburg Circle, Scott's residence of record, had drugs on the premises.[15] Thus, on August 22nd, the parole officers and local law enforcement officials had two reports of the presence of drugs at Scott's residence of record. They also knew that Scott was on parole from incarceration for drug offenses. Moreover, a few months prior, Scott had been arrested at the same residence under conditions (bloated, bloody nose with suggestive statements from Scott himself) strongly hinting that he had been using cocaine. Moreover, Officer Sancken had been trying to get Scott into a substance abuse treatment program for a problem with cocaine and knew that, prior to his March 2005 arrest for a parole violation, Scott had had urine screens that were positive for cocaine. Based on the totality of the circumstances, the Court comfortably concludes that the search of Scott's residence on August 22nd was supported by reasonable suspicion of criminal conduct by Scott.

In sum, a standard condition of Scott's parole provided that he agreed to submit to warrantless searches of his "person, papers, place of residence, automobile or any other property under [his] control." On August 22, 2005, officers had reasonable suspicion that Scott was engaging in criminal conduct, and therefore were authorized to conduct their warrantless search of Scott's residence of record, regardless of any consent that may have

---

[15] As noted above, Inv. Bracken's source was "working off" charges, and Inv. Bracken testified that he doubted his source and Officer Stephens's source were the same person.

been offered, or offered with restrictions, by Ms. Polk. The search was reasonable, and the current state of the law does not provide for limiting the use of the contraband discovered, as is suggested by defense counsel, to revocation proceedings. Accordingly, there is no merit to Scott's motion to suppress.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Scott's motion to suppress be **DENIED**.

SO REPORTED and RECOMMENDED this 21st day of April, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

# United States District Court
## Southern District of Georgia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| vs. | * | CASE NO. CR106-12 |
| DEWAYNE RODRIQUEZ SCOTT | * | |
| | * | |
| | * | |

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Report/Recommendation dated 4/21/06, which is part of the official records of this case.

Date of Mailing: 4/21/06
Date of Certificate: 4/21/06

SCOTT L. POFF, CLERK

By _L. Debrdiu_

NAME:
1. Dewayne Rodriquez Scott
2. Timothy E. Moses
3.
4.
5.
6.
7.

Cert/Copy
- ☐ ☐ District Judge
- ☐ ☒ Magistrate Judge
- ☐ ☐ Minutes
- ☐ ☐ U.S. Probation
- ☐ ☐ U.S. Marshal
- ☐ ☒ U.S. Attorney
- ☐ ☐ JAG Office

Cert/Copy
- ☐ ☐ Dept. of Justice
- ☐ ☐ Dept. of Public Safety
- ☐ ☐ Voter Registrar
- ☐ ☐ U.S. Court of Appeals
- ☐ ☐ Nicole/Debbie
- ☐ ☐ Ray Stalvey
- ☐ ☐ Cindy Reynolds